Jacob Rassner, New York City, for libelant.

Hanrahan & Brennan, New York City, for respondent, by Michael E. Hanrahan, New York City, of counsel.

BYERS, District Judge.

This libelant's cause is that the loss of sight in his right eye resulting from atrophy of the optic nerve, as manifested probably on July 10, 1945 in connection with an acute and painful swelling on the right side of his face, was the result of a fall to the deck of a ship on which he was working, on the preceding April 11th. The immediate result of that fall was a small laceration just above and to the right of the right eye, which was promptly treated. The wound was washed with alcohol, and sulfanilimide was applied, and a bandage (band-aid?) was affixed. Seemingly no later evidence of a local condition was reported by the patient or observed, but five days later he complained of headaches.

**Bernardino BARROS, Jr., Libelant,**

v.

**UNITED STATES of America, Respondent.**

**No. 19665.**

United States District Court
E. D. New York.

Jan. 4, 1957.

---

5.  Damages have been waived.

The libelant was a wiper in the engine-room crew of the S.S. Frank P. Walsh, and signed on that ship March 31, 1945. The voyage started at Halifax on April 5, 1945 when the Walsh joined a convoy bound for Cardiff and other ports in Europe. She carried bombs and was engaged in wartime service.

The subsequent dates of consequence are:

1945

| | |
|---|---|
| April 20 | Arrived at Cardiff. |
| April 30 | Left for Plymouth. |
| May 1 | Arrived off Bayeux. |
| May 11 | Libelant reported to Dental Clinic, U. S. Army LeHavre. Treated for gum boils upper left and severe pain; diagnosis, abscessed teeth. Treatment: Ice bag applied to face, and given sulfathiazole and soda. |
| May 17 | Nothing found wrong except a mild case of trench mouth for which treatment was given. "Patient was sent to 346th Med. Comp." |

As to the incidents of his stay in Havre, the deposition of the purser-pharmacist Thompson offered by both libelant and respondent, contains the following:

"* * * I took all the men over to the Army hospital * * * and there the men were treated by Army dentists and physicians. I recall * * * Barros, having some extractions and I also recall he had something the matter with his mouth * * * I believe it was diagnosed as trench mouth."

| | |
|---|---|
| May 22 about | Arrived at Southampton. (Libelant asked for no medical attention in that port.) |
| June 12 | Arrived in New York, and libelant was paid off. |
| June 29 | Signed on as wiper on S.S. Cyrus H. K. Curtis American Export Lines, after taking medical examination for physical fitness. As to incident of this service, see below. |
| July 2 | Reported to Marine Hospital, Hudson & Jay Sts.; complained of "pain in the face." He there had a tooth extracted, and the diagnosis was: "No sign of infection from extraction at this time. Complaints: Cavernous sinus thrombosis following extraction." |
| July 5 | Reported to Cumberland Hospital. There seems to be no hospital record, but the assumption is that he was at once sent to the Kings County Hospital. |
| July 5 to Aug. 7. | Received at Kings County Hospital, and continued as in-patient until discharged on latter date. On admission the diagnosis was: "Facial cellulitis—Associated Diseases: Orbital abscess." |

The pain and swelling was on the right side of the face.

It should be said in parenthesis that the testimony of the libelant is so confusing and uninforming, due to his inability to understand and speak English (and the incapacity of one who was called to act as interpreter from Portugese into English), that his narrative does not rise to the level of testimony, either as to his accident or physical condition. What is herein related is gathered from what other witnesses deposed. The fact that there was one or more tooth extractions in Havre is thus accepted for present purposes.

Without quoting the Kings County Hospital record in detail, it will suffice to say that the swelling and accompanying pain became increasingly acute, and the patient received constant care and professional attention because the inflammatory developments were so severe that his eye soon protruded and pus was discharged in considerable volume; the condition created such pressure that a complete atrophy of the optic nerve of the right eye resulted, so that he lost the sight in that eye; hence this cause, on the theory that the unfortunate outcome of his hospitalization was primarily due to the injury that he suffered on April 11th when he fell to the deck of the Walsh as above set forth.

The original libel was filed April 30, 1951 and the amended libel October 29 of the same year, and in the latter, two causes are pleaded, namely, negligence, in that "the libelant was ordered and directed to perform duties on an open deck during rough seas, thus unduly exposing him to danger, and the respondent was further at fault in that * * * having ordered him to work on the open deck, * * * failed to make proper observation as to the wind, weather and seas, and maneuver the vessel to afford libelant some protection from the rough seas, and * * * in failing to provide any or sufficient life lines, safeguards or other safety measures * * * which resulted in the libelant's being thrown about with force and violence and suffering the injuries complained of."

The second cause is for maintenance and cure.

■ As to the first, there is no testimony whatever to sustain the cause.

This ship was a member of a convoy which means that it was navigated in obedience to the directions of a commanding officer. It is true that on April 11th the ship had run into extremely rough weather, almost of hurricane force, and at times the waves were higher than the ship itself. The libelant is said to have lost his balance and struck his head while on the deck, pursuant to an order of a superior requiring him either to procure or retrieve certain tools needed by the engineer force in connection with the maintenance of the engines. There is no testimony on the subject of life lines.

The libelant cites several cases involving injuries suffered during rough seas, all of which have been examined; they are to the effect that whether under given circumstance an injured member of a crew was ordered to perform a hazardous task because of the neglect or ignorance of one of the ship's officers, is a question of fact under all the circumstances of a given case, which is the principle that will govern this decision.

One of the cited cases is Matson Nav. Co. v. Hansen, 9 Cir., 132 F.2d 487, 488, where the injured man was caused to walk across exposed steel beams which were loaded on deck, and which were so disposed that he was caused to perform his duty in an unsafe place to work.

The District Court had found in favor of the libelant on that theory, and in affirming, the Court wrote in part:

"No liability flows from requiring a sailor to perform his necessary sailor's duties with the ship rolling and lurching in a heavy storm, even though he may be injured from a fall caused by a wave sweeping across the deck. Yet the owner would be liable if, instead of performing some necessary duty, he were injured when sent by the mate across the same wave swept deck to

rescue the ship's cat. The test is whether the requirement of the sailor is one which a reasonably prudent superior would order under the circumstances."

Having in mind the necessary restrictions under which this vessel was navigated as a member of a convoy, there is nothing disclosed in the testimony offered for the libelant, which would justify a finding that his injury was the result of negligence on the part of the ship; surely there was no requirement that it should move out of formation and heave to, to enable this libelant to fetch some tools from wherever they were, under the most favorable possible conditions of wind and sea.

The finding of fact is that the first cause as pleaded, is not supported by evidence.

The case for maintenance and cure confronts the court with the uncongenial task of selecting which of two medical theories should be accepted as to the primary cause of the libelant's said loss of vision.

The libelant's professional witnesses were:

Dr. C. R. Franklin, whose qualifications in the field of ophthalmology are stated in full in the record. He first examined the libelant in October of 1947, over two years after the unfortunate condition had become established;

Dr. Irving J. Selikoff, a general practitioner, who first examined the libelant on November 11, 1947, and

Dr. William S. Yesko, a dentist whose examinations of the libelant were made on November 11 and November 19, 1947.

The respondent called Dr. Jack Lisman, whose qualifications in the field of ophthalmology are also stated in the record and are not challenged by the libelant. His examination of the latter took place on June 19, 1956.

It is obvious that each of these witnesses undertook to expound a theory based upon a local examination long after the libelant had lost the sight of his right eye.

Necessarily the Kings County Hospital records were the only source of information open to any of these gentlemen concerning the medical history of the patient from July 5, 1945 until the following August 7th; since none of the libelant's witnesses had examined those records prior to giving his testimony, the opinion expressed by each obviously lacks a foundation based upon a considered examination and understanding of the data so recited.

Dr. Franklin was of the opinion that a streptococcus infection had nothing to do with the libelant's blindness and that the competent, producing cause was a trauma resulting from his fall on the deck of the ship and striking his head, causing the laceration above described. This witness expressed the opinion that the damage to the optic nerve was caused by what he described as a descending degeneration, namely:

"* * * the optical fibers are distributed through the optical center in the geniculocalcrine pathway and out to the brain, and a great deal of blindness is produced by injury to those fibers, and the degenerative process starts above and comes down to the eye.

"The Court: In your opinion where did the descending degeneration take place in this patient?

"The Witness: Somewhere in the optic pathway behind the chiasmer ridge and most likely due to some pressure caused from bleeding, I don't know.

"The Court: But that was not within the orbit?

"The Witness: No, sir, no, sir.

"The Court: Did you take into consideration in making your answer, the finding that on July 5, 1945 there was normal reaction on the part of both pupils?

"The Witness: I did not know that. .

"The Court: You did not take that into consideration?

"The Witness: I did not know it and naturally would not."

Thus it will be seen that the mechanics of the process which formed the basis of this witness' testimony were not clearly portrayed, nor did the witness seem to have a clear conception of his own theory, because it was impossible to discover from his entire testimony whether he thought that infection as clearly set forth in the hospital record, played any part in the ultimate result which has been described.

Dr. Selikoff was more broadminded. Thus, when the respondent's proctor contended to him that the blindness was due to infection and that the accident had nothing to do with it, the witness said:

"I think you're right. We are only disagreed on the second part of your question. I think it's almost self-evident that without the accident the man's infection could not have caused this blindness, but when you say the infection was an important thing, I agree with you 100 percent."

As to Dr. Yesko, little need be said. He based his testimony upon his X-rays, which he said did not show as to the bone structure any traces of infection; but that he was not expressing an opinion concerning a soft tissue infection; since it is the latter which is clearly shown in the Kings County Hospital record, his testimony is of no affirmative assistance.

The respondent's witness, Dr. Lisman, having made a careful study of the hospital records, expressed the opinion that the nature of the infection, its duration and extent created such a pressure upon the optic nerve that blindness was the result; his demeanor and testimony were more convincing and objective than that of Dr. Franklin, as the record will disclose.

If a choice must be made—and probably one is required—it is in favor of the explanation advanced by Dr. Lisman.

Among other incidents of the Kings County Hospital record that seem to corroborate this witness' opinion, are the following:

A negative blood test;

An abscess, which would account for the flow of blood referred to in the report.

Additional considerations which seem to vindicate Dr. Lisman's opinion are:

The failure of the libelant to complain of injuries caused by the trauma of April 11th when he was receiving treatment at Havre;

His failure to seek medical attention when the ship was at Plymouth after leaving Havre;

His failure to seek medical attention on arrival in New York on June 20th; and

His signing on the American-Export vessel on June 29th after undergoing a physical examination, which he passed. During that interval of nine days the libelant seems not to have required medical attention.

In this connection mention should be made of an earlier litigation instituted by this libelant against American-Export Lines in June of 1946 in the Southern District. A libel was filed in which it was claimed that this libelant had lost the sight of his right eye by reason of steam escaping from a valve. Thus:

"On or about the second day of July, 1945, while libelant was engaged in his duties in the engine room of said vessel, suddenly and without any fault on his part and wholly and solely through the recklessness, carelessness, and negligence of respondent's agents, etc. libelant was caused to be struck in the face by steam, as a result of which he sustained severe and permanent injuries."

The proctors in that case were Messrs. Fink & Frank, and it was eventually discontinued.

The present proctor for libelant stated:

"They investigated the causal relationship between the blindness

and the alleged steam episode which took place on the American Export Lines ship."

When the foregoing had been brought to light, the libelant was asked about the litigation and the alleged occurrence, and for what it is worth, he said, among other things, that seemingly he was engaged in washing down the boiler with the use of steam hose, "the man be working over there when the heat start, heat again more hot. Just for trouble he blame the American Export Line for that because this is come from the company."

If there was any such happening, it may explain what caused an existing infection to become acute, and thus to account for the July 3rd comment made at the Marine Hospital as to the libelant's condition following the tooth extraction.

Incidentally, if this record shows whether a molar on the left or right side of the libelant's upper jaw was extracted, the court has been unable to find it.

█ The finding on this branch of the case as above suggested, is that the loss of vision was due to infection, and not to trauma suffered by libelant on April 11, 1945.

If this is found to be clearly erroneous, it may save expense and effort, to state that an award for maintenance and cure would be limited by stipulation of counsel to the period of two months after libelant left the Kings County Hospital. The figure of $6 per day as of 1945 is thought to be proper, and would justify an award of $360.

In this connection it is not forgotten that Dr. Lisman thought the infection probably had its origin on May 10, 1945 when there was an extraction in Havre. On that theory the same award would be appropriate, but such is not the libelant's cause as will appear from the foregoing discussion. He has elected to stand on the trauma without reference to the infection, but has failed to demonstrate its part in his unfortunate loss of vision.

Decree to be settled for respondent, dismissing the libel as to both causes, but without costs.